# United States Court of Appeals
## For the First Circuit

No. 18-1487

UNITED STATES, ex rel. JAMES BANIGAN and RICHARD TEMPLIN; STATE OF FLORIDA, STATE OF ILLINOIS, STATE OF INDIANA, STATE OF LOUISIANA, COMMONWEALTH OF MASSACHUSETTS, STATE OF MICHIGAN, STATE OF NEW MEXICO, STATE OF NEW YORK, STATE OF TENNESSEE, STATE OF TEXAS, COMMONWEALTH OF VIRGINIA, STATE OF NORTH CAROLINA, ex rel. JAMES BANIGAN and RICHARD TEMPLIN,

Plaintiffs, Appellants,

STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF CONNECTICUT, STATE OF DELAWARE, DISTRICT OF COLUMBIA, STATE OF GEORGIA, STATE OF HAWAII, STATE OF MARYLAND, STATE OF MINNESOTA, STATE OF MONTANA, STATE OF NEVADA, STATE OF NEW HAMPSHIRE, STATE OF NEW JERSEY, STATE OF OKLAHOMA, STATE OF RHODE ISLAND, STATE OF WISCONSIN, CITY OF CHICAGO, ex rel. JAMES BANIGAN and RICHARD TEMPLIN,

Plaintiffs,

v.

PHARMERICA, INC.,

Defendant, Appellee,

OMNICARE, INC.; ORGANON PHARMACEUTICALS USA, INC.; ORGANON USA, INC.; SCHERING PLOUGH CORP.; AKZO NOBEL NV.; MERCK & CO., INC.; ORGANON BIOSCIENCES N.V.; ORGANON INTERNATIONAL, INC.,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

Before

Torruella, Lipez, and Kayatta,
<u>Circuit Judges</u>

---

       <u>Zenobia Harris Bivens</u> and <u>Michael Hurta</u>, with whom <u>Joel M. Androphy</u>, <u>Berg & Androphy</u>, <u>Michael E. Mone, Jr.</u>, <u>Patricia L. Kelly</u>, and <u>Esdaile, Barrett, Jacobs & Mone</u> were on brief, for appellants.
       <u>Benjamin M. McGovern</u>, with whom <u>James D. Smeallie</u>, <u>Michael Manthei</u>, and <u>Holland & Knight LLP</u> were on brief, for appellee.

---

February 19, 2020

---

**LIPEZ**, <u>Circuit Judge</u>.  James Banigan and Richard Templin (collectively, "relators") brought this qui tam action under the False Claims Act ("FCA") and several of its state law equivalents alleging that PharMerica, Inc. ("PharMerica") defrauded the government by participating in a Medicaid scheme that rewarded it financially for incentivizing physicians to change patients' prescriptions to the drug manufacturer Organon's antidepressant medications.  The district court dismissed the relators' FCA action under the public disclosure bar, which excludes from the subject matter jurisdiction of federal courts qui tam actions that are "based upon the public disclosure of allegations or transactions" in a civil "hearing," among other sources.  31 U.S.C. § 3730(e)(4)(A) (2006).[1]

Although we share the district court's view that an earlier FCA action involving the same scheme triggers the public disclosure bar, we conclude, contrary to the district court, that Banigan falls within an exception to that bar as an "original

---

[1] The public disclosure bar was jurisdictional in nature until the FCA was amended through the Patient Protection and Affordable Care Act of 2010 ("PPACA").  The PPACA amendments replaced the prior language of the provision, which provided that "no court shall have jurisdiction over an action" that is based on a prior public disclosure, 31 U.S.C. § 3730(e)(4)(A) (2006), with a mandate that courts "shall dismiss" such an action, see Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119, at 901 (2010).  The pre-PPACA version of the FCA applies here because the relators' original complaint was filed in 2007.  Therefore, all citations to the FCA are to the 2006 edition of the statute.

source of the information." Id. We therefore reverse the district court's dismissal of the FCA action against PharMerica and remand for further proceedings.

I.

**A.   Legal Background**

"The FCA prohibits the knowing submission of false or fraudulent claims to the United States." United States ex rel. Poteet v. Bahler Med., Inc., 619 F.3d 104, 107 (1st Cir. 2010) (citing 31 U.S.C. § 3729(a)). The relators' FCA claims are based on PharMerica's alleged violations of the Anti-Kickback Statute ("AKS"), which prohibits the solicitation or receipt of "any remuneration (including any kickback, bribe, or rebate)" in exchange for purchasing or ordering any good or item "for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b)(1)(B). The AKS was designed to prevent medical providers from making decisions based on improper financial incentives rather than medical necessity and to ensure that federal health care programs do not bear the costs of such decisions. See United States v. Patel, 778 F.3d 607, 612 (7th Cir. 2015). The AKS was amended in 2010 "to create an express link to the FCA," Guilfoile v. Shields, 913 F.3d 178, 189 (1st Cir. 2019), but the courts had already recognized that "liability under the False Claims Act can be predicated on a violation of the Anti-Kickback Statute." United States ex rel. Westmoreland v.

- 4 -

Amgen, Inc., 812 F. Supp. 2d 39, 54 (D. Mass. 2011) (collecting cases).

When a relator brings a qui tam action on behalf of the government, the United States is entitled, but not required, to intervene and take over the prosecution of the case. 31 U.S.C. § 3730(b)(2). If the government declines to intervene, the relator has the right to proceed with the suit on the government's behalf. Id. § 3730(c)(3). Whether the government intervenes or not, the relator is usually entitled to receive a percentage of any settlement or any damages that are awarded. Id. § 3730(d)(1)-(2).

The public disclosure bar is designed to prevent opportunistic relators enticed by the financial incentives that the FCA provides "from bringing parasitic qui tam actions," see Poteet, 619 F.3d at 107, that is, suits that are "based upon the public disclosure of allegations or transactions in," as relevant here, a civil "hearing."[2] 31 U.S.C. § 3730(e)(4)(A). A lawsuit is "based upon" a prior public disclosure if the relator's allegations are "substantially similar to" the information already in the public domain. United States ex rel. Ondis v. City of Woonsocket, 587 F.3d 49, 58 (1st Cir. 2009). The statute includes

---

[2] "[A]s used in the statute, 'hearing' is synonymous with 'proceeding.'" Poteet, 619 F.3d at 113. "[A] disclosure in a civil complaint is a disclosure in a civil proceeding" and thus constitutes a public disclosure from a statutorily enumerated source. Id.

an exception to the jurisdictional bar, however, when "the person bringing the action is an original source" who has "direct and independent knowledge of the information on which the allegations are based."  Id. § 3730(e)(4)(A)-(B).  Thus, the court retains jurisdiction over the qui tam action if the relator is an original source, even though the allegations are substantially similar to the information revealed in the prior public disclosure.

B.    Factual Background

### 1. Facts Alleged by Relators[3]

PharMerica is one of the largest long-term care pharmacy companies in the United States, providing pharmacy supplies and services to nursing homes and other facilities.  Most nursing homes contract with long-term care pharmacy companies like PharMerica which, in turn, contract with pharmaceutical companies[4] to purchase the medications that will be dispensed to nursing home residents.

---

[3] We draw these facts from the relators' third amended complaint and the exhibits that accompany it.  See Rockwell Int'l Corp. v. United States, 549 U.S. 457, 473 (2007) (holding that the term "allegations" as used in § 3730(e)(4) "is not limited to the allegations in the original complaint" and "includes (at a minimum) the allegations in the original complaint as amended" (emphasis in original)); see also United States ex rel. Cunningham v. Millennium Labs. of Cal., Inc., 713 F.3d 662, 670-71 (1st Cir. 2013) (comparing allegations "in the original complaint and retained in the amended complaint" to prior public disclosure).

[4] The long-term care pharmacy companies also contract with larger long-term care buying groups or group purchasing organizations, which negotiate contracts on behalf of pharmaceutical companies.

Nursing homes also often have a dedicated physician who works closely with the in-house nurses and pharmacy staff to provide medical care to residents. This structure means that long-term care pharmacy companies and their pharmacists exert considerable influence over the choice of medications used in nursing homes.

The relators are both former employees of the pharmaceutical company Organon, which manufactures antidepressants called Remeron Tablet and Remeron SolTab. Remeron Tablet was patented, developed, and put on the market first. The patent for Remeron Tablet expired in 1998, and generic manufacturers were expected to enter the market in 2001. To stymie generic competition, Organon developed Remeron SolTab -- a disintegrating tablet that is a "variant" form of Remeron Tablet -- and launched it in 2001. Because Remeron SolTab was not considered "equivalent" to Remeron Tablet, generic competitors were unable to manufacture and market a similar product to Remeron SolTab.

For years, Organon offered only modest discounts of about 2% on its medications as incentives when contracting with long-term care pharmacy companies. The relators acknowledge that those incentives arguably fall within a limited exception to the AKS for fixed discounts given to group purchasing organizations. See 42 U.S.C. § 1320a-7b(b)(3)(C). Between 1999 and 2000, however, Organon began offering contract terms that included greater, non-exempt discounts on Remeron Tablet in an effort to increase its

- 7 -

market share.  Those contracts included an 8% to 14.8% "ramp-up" discount for the first five months of the contract term, followed by a discount of anywhere between 8% and 15% that depended upon the market share held by Remeron Tablet (referred to as a market-share discount).  Those deals incentivized long-term care pharmacy companies to switch prescriptions from other drugs to Remeron Tablet, thereby boosting its market share and the discount awarded by Organon to the companies.  Making that switch on the basis of profit potential rather than the "medical propriety" of a given drug, the relators allege, violates the AKS.

The switch from a medication prescribed by the patient's doctor to a medication preferred by the pharmacy is referred to as "therapeutic interchange," and it can be accomplished in several ways.  The pharmacy can try to persuade physicians to write new prescriptions to move a patient to the preferred drug by touting its supposed advantages.  Or the pharmacy can use a device called an "NDC lock," which sets up the pharmacy's computer system so that only the preferred drug may be dispensed by the pharmacist.  When an NDC lock blocks a drug from being dispensed, the pharmacist must quickly obtain from the physician a new prescription for that patient for a preferred drug that is not blocked.  Or the pharmacy can ask physicians to sign broader agreements that cede to the pharmacist "their authority to choose what drug will be prescribed within a particular class."

PharMerica entered into a series of contracts with Organon, beginning in 1999 and lasting until 2005, that included incentives for PharMerica to purchase Remeron Tablet and Remeron SolTab and to engage in therapeutic interchange. The first iteration of the contract included only a "ramp-up" discount followed by a market-share discount. Then, in 2000, PharMerica agreed to implement a therapeutic interchange program. Its contract with Organon provided for a "ramp-up" discount, a market share discount, a "therapeutic interchange bonus" for switching prescriptions for other companies' antidepressants to Remeron Tablet or Remeron SolTab, and a "conversion rebate" for changing Remeron Tablet prescriptions to Remeron SolTab. Eventually, all of the discounts were changed to rebates.[5] Through several

---

[5] In 1999, many states determined the Medicaid reimbursement rate for medications based on the drug's "Average Wholesale Price" ("AWP"). See Grant Bagley et al., Accurate Drug Price Reporting: A Modest Proposal, 19 No. 11 Andrews Pharmaceutical Litig. Rep. 13 (Jan. 2004). "AWPs are published by private reporting services" and are "commonly understood as a 'sticker price' with little connection to market prices." Id. Thus, the AWP did not match the "actual acquisition cost," i.e., the amount a company actually paid, to purchase a medication from a drug manufacturer. Around 2001, states began changing their Medicaid reimbursement systems to calculate reimbursement based upon the actual acquisition cost rather than AWP. Under that system, companies must often submit their purchase invoices to receive reimbursement. Because discounts are reflected in purchase invoices, long-term care pharmacy companies could not hide those financial incentives when seeking Medicaid reimbursement. The change, therefore, prompted Organon to start offering rebates -- which are not reflected in purchase invoices because they are "calculated only after the fact" -- instead of discounts.

contract amendments, Organon continued to provide ramp-up rebates, market-share rebates, conversion rebates, and therapeutic interchange bonuses to PharMerica in various forms until the end of 2005.

Two executives at Organon, Carroll McKenna and John Maddox, were primarily responsible for coordinating Organon's contracts with long-term care pharmacy companies. Together they devised the business plan that included the discounts and rebates described above. The relators' complaint refers to McKenna and Maddox's plan to influence long-term care pharmacy companies to obtain prescriptions for Remeron Tablet and Remeron SolTab based on those financial incentives, rather than medical necessity, as the "Medicaid scheme." Between 1999 and 2005, Banigan was a member of the leadership team within the same department as McKenna and Maddox, but he was not involved with sales or contract negotiations with long-term care pharmacy companies.

Nevertheless, word of the Medicaid scheme made its way to Banigan. In the middle of 2000, Banigan was among the recipients of an email from Maddox with the subject line "Cost of Antidepressants in Nursing Homes," in which Maddox first proposed marketing Organon's antidepressants to long-term care pharmacy companies by highlighting the potential for those companies to profit if they switched patients to Organon's medications. At that time, Medicaid reimbursement was based on AWP, which could be

higher than the amount the company actually paid. The discounted prices that Organon offered to long-term care pharmacies lowered their acquisition cost. If the AWP was higher than that acquisition cost, the companies would profit from the Medicaid reimbursement.

In his email, Maddox explained that this "spread" between the AWP and the discounted price long-term care pharmacy companies paid for Organon's antidepressants was "an advantage" for Organon "that many pharmacists are not looking at." A year and a half later, in late 2001, Maddox emailed Banigan and another Organon employee asking for their input about a proposal to develop two contracts -- one version that provided only an "upfront discount" and the other a "minimal" upfront discount followed by rebates -- to use in different states depending upon how they calculated Medicaid reimbursement. This proposal appears to mark the beginning of the transition from discounts to rebates in Organon's contracts, as described above. See supra note 5.

Organon underwent some changes in management in 2003, and concern about job stability percolated through the leadership ranks. Against that backdrop, both McKenna and Maddox approached Banigan in late 2003 and talked with him about the Medicaid scheme. Banigan first spoke with McKenna, who told him about "marketing materials and other communications" that were used to inform "customers how to maximize their profits by influencing providers

- 11 -

to prescribe Remeron." McKenna also "explained that the Marketing Department conspired with [the] sales team to market Remeron almost purely based on profit potential." He told Banigan that he considered this information to be his "insurance policy" that he could use against Organon if the company tried to force him out. The following day, Banigan had a similar conversation with Maddox, who also told Banigan about the marketing materials.

Several years went by before Banigan heard anything else about the Medicaid scheme. In 2006, Banigan transferred to a different position in a different department within Organon, and Templin was hired for a job in Banigan's former department. Like Banigan, Templin soon heard about the existence of the scheme from one of its creators. Maddox "divulged" to Templin "the existence of a 'non-compliant' program that provided him with a 'get-out-of-jail-free card with Organon.'" After his conversation with Maddox, Templin decided to investigate on his own what Maddox told him. Over the next few months, Templin "learned that the program [developed by Maddox and McKenna] centered on marketing the 'opportunity to profit' in the long-term care market," a fact which McKenna later confirmed in a conversation with Templin.

With this information in hand, Templin sought Banigan out in April 2007 to see if he knew about the scheme. Banigan confirmed that he did and, after speaking with Templin, decided to conduct his own investigation to see if he could turn up copies of

the marketing materials that McKenna and Maddox had described to him. Banigan eventually obtained original copies of the marketing materials from a former Remeron brand director who had kept the materials at his home. The materials confirmed "how blatantly Organon had promoted the 'opportunity to profit'" with incentives and kickbacks. Seeking further confirmation, Templin and Banigan then located the contracts between Organon and its largest long-term care pharmacy customers, "and found that the contracts' terms evidenced the same types of incentives reflected in the promotional materials."

The relators' complaint alleges that, despite this pervasive Medicaid scheme, PharMerica falsely certified its compliance with state and federal laws applicable to the Medicaid program, including the AKS, each time it submitted a claim for reimbursement for Remeron Tablet and Remeron SolTab.

## 2. Earlier Qui Tam Action Against PharMerica

In late 2002, William St. John LaCorte, M.D., filed a qui tam action under the FCA against PharMerica and its parent company in federal district court in Louisiana. Compl. at 1, United States ex rel. LaCorte v. AmerisourceBergen Corp., No. 02-3168 (E.D. La. Oct. 18, 2002), 2002 WL 32943919 (hereinafter "Amerisource"). A doctor who treated patients in hospitals and nursing homes in and around New Orleans, LaCorte alleged that PharMerica entered into contracts with pharmaceutical

- 13 -

manufacturers under which PharMerica received "financial inducements in the form of discounts, remuneration, rebates, or kickbacks" in exchange for using its "Select Formulary"[6] to boost the market share of the manufacturers' drugs by substituting them for the drugs prescribed by patients' physicians.

LaCorte's FCA claims were premised on violations of multiple state and federal statutes, including the AKS. Like Banigan and Templin, LaCorte alleged that participants in Medicaid programs must certify compliance with the requirements of state and federal law for the services they provide when they seek reimbursement for those services. LaCorte alleged that PharMerica violated the AKS by accepting "illegal remuneration and kickbacks" and then caused hospitals and nursing homes where it operated to submit false claims for reimbursement by concealing its non-compliance with the AKS and other state and federal laws.

The Amerisource complaint provides a non-exhaustive list of PharMerica's preferred drugs, including "Remeron."[7] Remeron SolTab is identified as a preferred drug in a copy of PharMerica's Select Formulary from 2003, which is attached as an exhibit to both the first and second amended complaints. LaCorte alleged

---

[6] The Select Formulary is PharMerica's list of preferred drugs.

[7] The parties to this appeal use "Remeron" and "Remeron Tablet" interchangeably.

that PharMerica caused physicians' prescriptions to be changed to Select Formulary drugs by either making the change without a physician's knowledge or consent or by obtaining the physician's consent by providing the physician with information that misrepresented the "preferred" drug's safety, effectiveness, and cost savings. The case ultimately settled and was dismissed by stipulation of the parties in 2008.

## C.   Procedural Background

On September 13, 2007, Banigan and Templin filed their qui tam action under seal against Organon, PharMerica, and other companies involved in the fraudulent scheme that they had discovered. After the submission of two amended complaints, the United States notified the court that it declined to intervene and the case was unsealed shortly thereafter. The relators then filed a third amended complaint. In 2011, PharMerica and the other defendants each sought dismissal of the claims against them. The district court resolved PharMerica's motion to dismiss in two separate orders, the first in June 2012 ("2012 Order") and the second in April 2018 ("2018 Order").

In the 2012 Order, the district court dismissed the relators' federal FCA claims against PharMerica under the public disclosure bar based on the Amerisource lawsuit.[8] The district

---

[8] In addition to the public disclosure bar, the district court's 2012 Order relied on the first-to-file bar, which precludes

court also dismissed the relators' state FCA claims that were brought under statutes that mirror the FCA but declined to dismiss the other state FCA claims pending further briefing from the parties.

After the relators filed a motion to reconsider, the district court deferred decision on that motion, and on PharMerica's motion to dismiss the remaining state law claims, until the relators' remaining federal FCA claims against other defendants were resolved. Between 2014 and 2017, the relators reached settlements with the other defendants.[9] In 2017, after those defendants had been dismissed, the district court permitted supplemental briefing on the relators' motion for reconsideration.

a relator's suit if there is already a separate, pending lawsuit that involves related claims. See 31 U.S.C. § 3730(b)(5). In 2015, however, the Supreme Court clarified that "an earlier suit bars a later suit while the earlier suit remains undecided but ceases to bar the suit once it is dismissed." Kellogg Brown & Root Servs., Inc. v. United States ex rel. Carter, 575 U.S. 650, 135 S. Ct. 1970, 1978 (2015). Therefore, as the district court later noted in its 2018 Order, Amerisource ceased to bar the relators' qui tam action under the first-to-file bar after the case was dismissed in 2008.

[9] The relators first entered into a settlement agreement with Azko Nobel and the "Organon Defendants" -- Organon USA Inc., Merck & Co., Inc., Schering Plough Corp., Organon Pharmaceuticals USA, Inc., Organon Biosciences N.V., and Organon International, Inc. -- and the district court dismissed those defendants on October 27, 2014. Almost three years later, the relators settled with Omnicare, Inc., and the district court dismissed it as a defendant on May 26, 2017.

The relators sought reconsideration on multiple grounds, including the original source exception.

In its 2018 Order, the district court denied the relators' motion for reconsideration of the 2012 Order and granted PharMerica's motion to dismiss the remaining state law claims. The district court concluded that neither Banigan nor Templin qualified as an "original source" because neither had direct knowledge of the information underlying their allegations. This timely appeal followed.

## II.

The relators argue that the public disclosure bar does not apply to their claims and, alternatively, that they fall within the original source exception. We review a district court's dismissal for lack of subject matter jurisdiction de novo. United States ex rel. Cunningham v. Millennium Labs. of Cal., Inc., 713 F.3d 662, 669 (1st Cir. 2013).

### A. Public Disclosure Bar

The public disclosure bar applies when (1) "there has been a prior, public disclosure of fraud," (2) "that prior disclosure of fraud emanated from a source specified in the statute's public disclosure provision," and (3) "the relator's qui tam action is 'based upon' that prior disclosure of fraud." Poteet, 619 F.3d at 109. The relators focus on the third

- 17 -

requirement, arguing that their qui tam action is not "based upon" the Amerisource litigation.[10]

"[T]he 'based upon' requirement is satisfied when the relator's allegations are substantially similar to allegations or transactions already in the public domain at the time he brings his qui tam action."[11] Ondis, 587 F.3d at 58. Thus, if the relators' allegations "ultimately target[] the same fraudulent scheme" that was previously disclosed, "[t]hat is enough to trigger the public disclosure bar." Poteet, 619 F.3d at 115. Consequently, "a complaint that targets a scheme previously

_____

[10] The relators assert in passing that they dispute the district court's finding that there was a prior, public disclosure of fraud sufficient to satisfy the first requirement, but they do not develop that argument further or otherwise support it. The argument is therefore waived. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990)("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."). In any event, the argument has no merit -- the prior disclosures at issue were made in "a civil complaint filed in court," which "qualifies as a public disclosure." Poteet, 619 F.3d at 111.

[11] Although our definition of "based upon" as "substantially similar to" is not readily reconcilable with the statutory language of the public disclosure bar, it best "comports with the overall structure and purpose of the FCA." Ondis, 587 F.3d at 58. As we explained in Ondis, if we interpreted the public disclosure bar to require that a relator's allegations actually be derived from a public disclosure, "the relator's knowledge never could be independent of that disclosure" and he could never be an original source. Id. (emphasis in original). Such an interpretation would "read the 'original source' exception out of the statute," contravening the "canon of statutory construction that requires courts, whenever possible, to give meaning to every word and phrase contained in the text of a statute." Id.

revealed through public disclosures is barred even if it offers greater detail about the underlying conduct." United States ex rel. Winkelman v. CVS Caremark Corp., 827 F.3d 201, 210 (1st Cir. 2016).

To distance the allegations raised in their complaint from the allegations disclosed in Amerisource, the relators argue that they describe "two distinct schemes" -- the "switching scheme" and the "conversion scheme" -- while the Amerisource relator, "at best," alleged facts related only to the switching scheme.[12] Under the relators' framework, the switching scheme includes PharMerica's acceptance of discounts, rebates, and other financial inducements specifically for switching patients' prescriptions from competitor manufacturers' drugs to Remeron Tablet. The conversion scheme, they assert, encompasses PharMerica's acceptance of those same financial inducements to "convert" prescriptions for one Organon drug, Remeron Tablet, to another, Remeron SolTab.

We are not persuaded that the relators' complaint describes two schemes. Indeed, the complaint itself refers to the fraudulent conduct as a single "Medicaid scheme." Though PharMerica's contracts with Organon applied different labels to

---

[12] At oral argument, counsel for the relators referred to a single scheme with two components rather than two separate schemes. Discerning no meaningful difference between the two formulations, we adopt the nomenclature set forth in the relators' brief.

- 19 -

different financial incentives -- for example, a "therapeutic interchange bonus" for switching prescriptions for competitor antidepressants to Remeron Tablet or Remeron SolTab and a "conversion rebate" for changing Remeron Tablet prescriptions to Remeron SolTab -- those labels are of no legal import. The AKS broadly prohibits the acceptance of "<u>any remuneration</u> (including any kickback, bribe, or rebate)" in return for purchasing medications that will be paid for under Medicaid. <u>See</u> 42 U.S.C. § 1320a-7b(b)(1) (emphasis added). Thus, the fraudulent conduct at the heart of the Medicaid scheme -- the use of financial incentives to induce PharMerica to persuade or mislead doctors to prescribe preferred antidepressants -- was the same despite variations in the kind of remuneration PharMerica received or the specific drug it substituted.[13]

Hence, the Medicaid scheme described in the relators' complaint is indistinguishable in all material respects from the fraudulent scheme disclosed in <u>Amerisource</u>. Both suits revealed that PharMerica violated the AKS by accepting kickbacks in exchange

---

[13] The two-scheme formulation and the relators' effort to distinguish their action from <u>Amerisource</u> on that basis reflects our decision in <u>Cunningham</u>, which identified three distinct "aspects" of a fraudulent scheme and found that only two of those aspects had been previously disclosed. 713 F.3d at 665-66, 675-76. But as we have said before, "<u>Cunningham</u> turned on the entirely unremarkable proposition that allegations of fraud distinct from previous disclosures are not blocked by the public disclosure bar." <u>Winkelman</u>, 827 F.3d at 210. We do not have that situation here.

for causing prescriptions to be switched to Remeron Tablet and Remeron SolTab, regardless of the medical propriety of the change, and then lied to the government about its compliance with the law to improperly obtain Medicaid reimbursement for the kickback-tainted medications.

Persisting in their effort to distinguish their claims from those in Amerisource, the relators argue that their allegations encompass a longer period of time and describe different and "more aggressive" methods that PharMerica used to change patients' prescriptions from Remeron Tablet to Remeron SolTab. But providing "greater detail about the underlying conduct" is not enough to avoid the public disclosure bar when the complaint "targets" the same fraudulent scheme that was revealed in a prior public disclosure. See Winkelman, 827 F.3d at 210. That is precisely the situation that we have here. We therefore conclude that the public disclosure bar applies.

B. Original Source Exception

Under the FCA, a court retains jurisdiction over an action that is based on a prior public disclosure if "the person bringing the action is an original source of the information." 31 U.S.C. § 3730(e)(4)(A). To qualify as an original source, a relator must have "direct and independent knowledge of the information upon which his own allegations were based." Ondis, 587 F.3d at 58-59; see also Rockwell, 549 U.S. at 470-71. On

appeal, the parties focus on the "direct" knowledge requirement of the statute. PharMerica does not dispute the "independent" requirement.[14]

The FCA provides definitions for only a handful of terms that appear in the statute, and "direct" is not one of them. In a prior FCA case, we resorted to the dictionary and adopted its definition of "direct" as being "marked by absence of an intervening agency, instrumentality, or influence: immediate." Ondis, 587 F.3d at 59 (quoting Webster's Third New International Dictionary 640 (2002)). Employing that definition, we agree that knowledge based entirely on "research into public records, review of publicly disclosed materials, or some combination of these techniques is not direct." Id. On the other end of the spectrum, knowledge obtained from personal observation of a fraudulent act or participation in it would clearly meet the directness requirement. Banigan's knowledge falls between those parameters.

Banigan received two emails from Maddox, one of the two architects of the fraudulent scheme, in 2000 and 2001, both of which were suggestive of the scheme but did not include much

---

[14] The relators rely solely on Banigan's original source status to meet the jurisdictional requirement in § 3730(e)(4) and do not argue that Templin is an original source. PharMerica, therefore, argues that "Templin cannot ride Banigan's jurisdictional coat-tails" and that we must dismiss all claims asserted by Templin. Because Templin does not respond to PharMerica's position that he cannot continue as a relator, he has waived any argument to the contrary. See Zannino, 895 F.2d at 17.

detail.  In the first email, Maddox informed his colleagues that he had hatched a plan to market Remeron Tablet to long-term care pharmacies by focusing on profit.  In the second, he sought input about different versions of the contract that Organon was offering to those companies.  Although the 2000 and 2001 emails lacked specifics, additional information came in 2003 when Maddox and McKenna told Banigan about materials that had been developed "to market Remeron almost purely based upon profit potential."  Banigan obtained the remaining information underlying the relators' claims through his own investigation, which led him to uncover original copies of marketing materials as well as the contracts that reflected the discounts and rebates at the heart of the Medicaid scheme.

PharMerica argues that Banigan's knowledge is not direct because he learned of the Medicaid scheme from McKenna and Maddox. It emphasizes that Bangian was not involved directly in creating the scheme, nor did he observe the scheme in operation.  Also, he did not know about it until it was "winding down" and he did not conduct his independent investigation until after the scheme had ended.  In short, PharMerica would require a relator to have either participated in the fraud or observed it in operation to qualify as an original source and would exclude a relator who discovered

the fraud after the fact and brought it to the government's attention.[15]

We disagree with that reading of the statute. Indeed, Pharmerica's reading would exclude a relator who is told by managers at his company that a department he does not work for is engaging in fraud. See United States ex rel. Saldivar v. Fresenius Med. Care Holdings, Inc., 841 F.3d 927, 936 (11th Cir. 2016). In Saldivar, the relator brought a qui tam action alleging that his company violated the FCA by billing the government for excess medication that it had received at no cost after company managers told him what the billing department was doing. Id. at 930-31. The Eleventh Circuit held that he did not qualify as an original

---

[15] The limitations that PharMerica urges us to adopt track those employed by the district court, which concluded that Banigan did not have "direct" knowledge because he did not have contemporaneous knowledge of the fraud, he did not see any corroborating documents until more than a year after the scheme had concluded, and he did not discover those documents in the regular course of his job duties. A number of circuits disqualify relators who did not participate in or witness the ongoing fraud. See, e.g., United States ex rel. Schumann v. Astrazeneca Pharm. L.P., 769 F.3d 837, 847 (3d Cir. 2014) ("[K]nowledge of a scheme is not direct when it is gained by reviewing files and discussing the documents therein with individuals who actually participated in the memorialized events."); United States ex rel. Newell v. City of St. Paul, Minn., 728 F.3d 791, 797 (8th Cir. 2013) ("[A] person who obtains secondhand information from an individual who has direct knowledge of the alleged fraud does not himself possess direct knowledge and therefore is not an original source under the [FCA]." (second alteration in original) (quoting United States ex rel. Barth v. Ridgedale Elec., Inc., 44 F.3d 699, 703 (8th Cir. 1995)).

- 24 -

source because "[b]eing told what another department is doing is almost necessarily not direct knowledge of that department's behavior." Id. at 936. We find that result incompatible with a core purpose of the FCA -- to incentivize disclosures of fraudulent activity underlying claims for reimbursement from the government. See S. Rep. No. 99-345, at 23-24 (1986), as reprinted in 1986 U.S.C.C.A.N. 5266, 5288-89.

Moreover, nothing in the statutory text limits "direct knowledge" to knowledge gained from participation in or observation of the fraud. The statute requires only that the person have "direct and independent knowledge of the information on which the allegations are based," not direct and independent knowledge of the fraudulent acts themselves. 31 U.S.C. § 3730(e)(4)(B) (emphasis added); see also Kennard v. Comstock Res., Inc., 363 F.3d 1039, 1044 (10th Cir. 2004) ("A relator need not . . . have in his possession knowledge of the actual fraudulent conduct itself; knowledge underlying or supporting the fraud allegation is sufficient." (alteration in original) (quotation marks omitted)).[16]

---

[16] We note that the 2010 amendments to the FCA removed the word "direct" from the original source exception. See Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119, at 901-02 (2010). The Judiciary Committee's report on the amendments to the FCA reflects a frustration that court decisions interpreting the public disclosure bar and original source provision had created "ambiguities" and "created a chilling effect on relators coming forward with claims because certain types of

We also decline to impose the contemporaneousness requirement that PharMerica urges us to adopt because it likewise finds no support in the text of the FCA and would only discourage reports of fraud. See United States ex rel. Duxbury v. Ortho Biotech Prods., L.P., 579 F.3d 13, 27 (1st Cir. 2009) (rejecting a restrictive interpretation of the original source exception that "did not have textual support" and would have discouraged "productive private enforcement suits").

Accordingly, we readily conclude that Banigan's knowledge satisfies our definition of "direct" as "immediate." See Ondis, 587 F.3d at 59 (quoting Webster's Third New International Dictionary 640 (2002)). As we explained in Ondis, "immediate" is shorthand for being "marked by absence of an intervening agency, instrumentality, or influence." Id. Banigan was a corporate insider at Organon who learned of the fraudulent scheme in which his own company and department participated while he was employed there.[17] He gained knowledge of the fraud from emails and conversations with Maddox and McKenna, the architects

cases cannot survive dismissal." S. Rep. No. 110-507, at 22 (2008), 2008 WL 4415147. The report explains that "erroneous court interpretations of the public disclosure bar" and narrow constructions of "the terms 'direct' and 'independent' under the original source exception" had led to the dismissal of "real meritorious cases." Id. at 24.

[17] We are not suggesting that one must be a corporate insider to meet the "direct" knowledge requirement.

- 26 -

and primary perpetrators of the fraudulent scheme, and from documents generated as part of the fraudulent scheme that he obtained through his own investigative efforts. There is no "intervening agency, instrumentality, or influence" between these sources and Banigan's knowledge of the Medicaid scheme. We do not think that Congress intended to reward as original sources only those who participated in the fraud. Indeed, Banigan would seem to be the most likely type of person to function as an original source. Congress's attempt to preclude parasitic claims need not preclude claims by whistleblowers.

As required by the statute, the allegations of fraud in the complaint are based upon Banigan's direct knowledge. The complaint uses the first Maddox email, sent in 2000, to mark the moment when the idea to market Remeron Tablet based on profit potential was born. It reveals that Banigan's conversations with Maddox and McKenna, and later with Templin, prompted him to search for the marketing materials they described to him. And much of the detail in the complaint is, in turn, drawn from the internal Organon documents that Banigan located as the result of that search -- for example, it lists in detail the various financial incentives that PharMerica received from Organon over a six-year time span based on multiple iterations of their purchase agreement. These sources easily meet the statutory requirement -- "direct and

- 27 -

independent knowledge of the information on which the allegations are based."  31 U.S.C. § 3730(e)(4)(B).[18]

We therefore reverse the dismissal of the FCA action, direct the district court to dismiss Templin as a relator, and remand for further proceedings.

So ordered.

---

[18] As noted, PharMerica does not dispute the "independent" requirement of the statute.